Filed 9/11/15  P. v. Mason CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C074893 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F70) |
| v. | |
| JOSHUA LOUIS MASON, | |
| Defendant and Appellant. | |

Defendant Joshua Louis Mason had an eventful day on January 3, 2011.  When a police officer stopped a vehicle in which defendant was riding, defendant walked away and attempted to carjack Nancy Luchs's car by threatening to kill her.  Defendant then stole William Miner, Jr.'s, pickup truck and drove it to the outskirts of Redding.  Unable to find a hiding spot, defendant stole another pickup truck that he drove recklessly as he fled the police.  When the pickup truck was immobilized by the police, it took several police officers and a police canine to extract him from the vehicle.  After receiving medical care for canine bites, defendant kicked one of the police officers who was transporting him to jail.

1

Based on these events, a jury found defendant guilty of carjacking (Pen. Code, § 215, subd. (a)),[1] attempted carjacking (§§ 215, subd. (a), 664), making a criminal threat (§ 422), two counts of unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)), reckless evasion of a peace officer (Veh. Code, § 2800.2), obstructing a peace officer (§ 69), and two counts of resisting arrest by a peace officer (§ 148, subd. (a)(1)). The jury also found defendant was sane at the time he committed the offenses. After the defendant waived his right to trial by jury on his prior convictions, the trial court found he had previously been convicted of a serious felony (§§ 667, subd. (a)(1), 1170.12) and served a prior prison term (§ 667.5, subd. (b)). The prior conviction and prison term related to the same 2003 conviction for first degree burglary (§ 459). Along with various fines and fees, the trial court sentenced defendant to serve 23 years in state prison.

On appeal, defendant contends (1) his conviction of unlawful taking of Miner's pickup truck must be reversed because the evidence at trial showed no more than his proximity to the truck before the taking, (2) insufficient evidence supported his conviction of issuing a criminal threat because Luchs never indicated she was afraid when defendant threatened her, (3) his sentence for conviction of either attempted carjacking or for issuing a criminal threat must be stayed under section 654 because both offenses were committed with the same intent and for the same purpose, and (4) his sentence enhancement under section 667.5, subdivision (b), must be stricken because he was also sentenced under section 667, subdivision (a), for the same prior conviction.

We conclude that when considering the entire record, substantial evidence supports the jury's finding defendant unlawfully took Miner's pickup truck. However, the testimony does not show Luchs experienced sustained fear as a result of defendant's threats. To the contrary, she testified she became mad because of defendant's conduct.

---

[1] Undesignated statutory references are to the Penal Code.

Because the evidence of criminal threat is insufficient, we do not consider defendant's contention that either the criminal threat or attempted carjacking sentence must be stayed under section 654. The Attorney General concedes, and we agree, the prison enhancement imposed under section 667.5, subdivision (b), must be stricken. We remand the matter to the trial court for resentencing on the remaining counts of conviction and to strike the one-year enhancement under 667.5, subdivision (b).

FACTUAL AND PROCEDURAL HISTORY

*Guilt Phase*

Around 2:00 p.m. on January 3, 2011, Redding Police Officer Aaron Maready decided to stop a car with an expired registration tab. Before Officer Maready could initiate the stop, the car pulled into a gasoline service station located at the corner of Mistletoe and Churn Creek in Redding. Two of the three occupants of the car got out, ignored Officer Maready's instructions to remain at the vehicle, and went inside the gasoline station's convenience store. Officer Maready spoke with the remaining passenger for a few minutes when he saw the driver and other passenger of the vehicle exit the convenience store. Officer Maready again instructed them to come back to the car. The driver complied, but the passenger -- later identified as defendant -- did not.[2] Instead, defendant walked away from the gasoline station and headed south.

While Officer Maready was still at the gasoline station, he heard a broadcast by the police dispatcher that a carjacking had just taken place at Aaron Brothers Art Mart. The information about the suspect given by the dispatcher described Officer Maready's observation of defendant's appearance.

Nancy Luchs was getting out of her Lincoln Navigator in front of the Aaron Brothers store when defendant walked up to her looking "kind of frantic." In a "very

---

**2** Defendant refused to attend the trial and was identified by photograph in lieu of in-court identification.

3

assertive" tone, defendant instructed: "Give me your car keys." Luchs told him, "Are you nuts?" Defendant kept telling Luchs to give him the keys and adding, "Don't make me kill you." Defendant repeated the threat approximately four times. Luchs testified that defendant's threats "really kind of made me mad." When asked if she feared for her safety, Luchs testified: "I just didn't think about that." To keep the keys away from defendant, Luchs turned around and tried to throw them into the car. But Luchs ended up dropping the keys on the ground. If she could have, Luchs would have jumped into the car and locked the doors.

Defendant and Luchs both reached for the keys at the same time and defendant ended up getting them. Not knowing what to do, Luchs leaned into the car and "laid on [the] horn" to draw attention. Defendant threw the keys into the car, turned, and walked away. Luchs went inside the store and called the police.

Redding Police Officer Douglas Moore responded to the scene. Officer Moore recalled Luchs told him defendant had "grabbed her by the back of her sweater trying to pull her out of her -- the doorway of her vehicle." At trial, Luchs could not recall making the statement. However, she noted that "a lot of time" had gone by since the incident, and "if that's what [she] said then, that's what happened."

While Officer Moore was speaking with Luchs, he received a report of a vehicle theft at 1099 Hilltop Drive. The reported location of the theft was within walking distance of the Aaron Brothers store.

Redding Police Officer Bart Langley was also dispatched to the Aaron Brothers store along with Officer Moore. However, while en route, Officer Langley "got called off due to the fact that there was a suspicious persons call on the area of 923 Jamison Court" that appeared to involve the same suspect as the attempted carjacking. The distance from the Aaron Brothers store to 923 Jamison Court is approximately "two long blocks."

4

At 923 Jamison Court, Vanessa Myers was serving lunch to her daughter when she noticed the shadow of a man near her rear sliding glass door. The man -- later identified as defendant -- looked through the door and then attempted enter. Defendant saw Myers and motioned that he wanted to use a telephone. Myers's husband came over and told defendant, "Get out of here." Defendant walked away. A few minutes later, a police helicopter buzzed overhead.

Myers stated the Country Kitchen Restaurant is close to her apartment. Myers noted, "We just go over a fence and that's the parking lot" for a business complex including Country Kitchen.

On January 3, 2011, Country Kitchen was having some of its equipment serviced by William Miner, Jr., and his father. That day, Miner was driving a blue Chevy pickup truck. During the 45-minute service call, Miner had the locked truck parked behind the restaurant. When Miner finished, he returned to the truck and turned it on. The owner of the restaurant had a question, and Miner went back inside the restaurant for a minute. Miner did not hear or see anything unusual outside. However, when he went back outside his truck was gone. Miner noticed a police helicopter flying nearby, and the police responded "within seconds" to his 911 call.

Miner's truck was next seen "down at the end of the road" from 18544 Martin Way, where Rebecca Roberts was living on January 3, 2011. Roberts "noticed the truck sort of kittywampus in the road" as she was returning home from a trip to Home Depot. As Roberts walked into her mobile home, she saw defendant inside with her son, William Terry, and his friend. Defendant was looking for a person named Melissa. Melissa had lived in the mobile home before being evicted by Roberts and Terry.

Defendant was pulling out drawers, seemingly looking for something. Roberts angrily asked, "Who the hell are you and what are you doing in my house?" Defendant responded, "Can you just hide me?" Roberts told him, "No. You just gotta leave." Roberts got her telephone and threatened to call the police.

5

Terry watched as defendant ran out the front door. Terry testified, "next thing I know, a few officers are going down the road chasing after him." Terry saw a blue truck get into a crash.[3] Although Terry did not see who the police pulled out of the truck, he later saw defendant's shoe at the place where the officers pulled the driver out of the truck.

Roger Parker's house is a block away from the road on which Roberts's mobile home sits. Sometime in the later morning or early afternoon of January 3, 2011, defendant knocked on Parker's door. When Parker answered, defendant asked to use the telephone, Parker gave defendant his cordless phone. Defendant appeared to be agitated and under the influence of "something." To Parker, it seemed defendant was only acting like he was using the phone because defendant had not dialed any numbers. In one hand, defendant held the phone and in the other hand a golf club. After a few minutes, defendant demanded the keys to Parker's pickup truck. Defendant raised the golf club as if to hit Parker. Parker asked defendant whether a police helicopter flying overhead was looking for him. Defendant answered that it was. Parker refused to hand over the keys to his truck.

Standing next to Parker was his visitor and long-time friend, Louis Simeroth. Simeroth grew concerned because he had his own pickup truck parked nearby in which he had left the keys in the ignition. Out of the corner of his eye, Simeroth saw police officers approaching. Simeroth and defendant ran over to Simeroth's pickup truck. Simeroth reached into the truck and put his hand on the keys when defendant tried to punch him. Defendant also tried to hit Simeroth in the face with the golf club, but no direct hit landed on Simeroth. Defendant jumped into the truck and sped off toward

---

**3** Although Terry described the crashed truck as blue, testimony by police officers established it was another truck -- which was white -- that defendant later crashed.

Oasis Road. About 45 seconds later, Simeroth heard a loud crash come from around the corner.

Redding Police Officer Christopher Smyrnos was driving a marked patrol car when he was dispatched to the Oasis Road area. Defendant sped by in a truck but crashed into a chain link fence when attempting to avoid the police vehicle. The truck's tires spun for a short time before the vehicle accelerated again.

When Officer Smyrnos next came across the truck, it had been pinned against a utility pole by another police vehicle. Several police officers were attempting to take defendant into custody. Using a police canine and physical force, the police were able to extricate defendant from the truck. But defendant continued to fight the officers. Defendant "was yelling, screaming, bucking, kicking, thrashing around, [with] every form of physical resistance." After being bitten by the police canine, defendant was transported by ambulance to the Shasta Regional Medical Center. After treatment, defendant continued to resist the officers and kicked Officer Adams several times in the thigh.

### *Sanity Phase*

The parties stipulated the jury could consider all trial evidence in determining whether defendant was sane at the time he committed the charged offenses. Kent Caruso, a forensic psychologist, testified he met with defendant in jail to interview him. Caruso concluded defendant had a self-induced mental defect as a consequence of his use of methamphetamine.

The prosecution also called clinical psychologist, Ray Carlson. Carlson conducted an extensive interview with defendant and gave him a few tests, including the Rogers Criminal Responsibility Assessment Scales. During the interview, Carlson did not notice any mental defect or disease in defendant. Carlson concluded defendant did not have "a free-standing mental condition, apart from his drug use, that diminished his appreciation for the nature and quality of his actions."

7

The jury found defendant was sane at the time he committed the charged offenses.

## DISCUSSION

## I

### *Sufficiency of the Evidence of Theft of Miner's Pickup Truck*

Defendant contends insufficient evidence supported his conviction of Vehicle Code section 10851, subdivision (a), for theft of Miner's pickup truck. Viewing the record as a whole, we conclude the evidence suffices to affirm the conviction.

### A.

### *Substantial Evidence Standard of Review*

As the California Supreme Court has explained, " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)" (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.)

The substantial evidence standard of review is the same for circumstantial evidence as it is for direct evidence of guilt. (*People v. Holt* (1997) 15 Cal.4th 619, 668.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably

8

justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' (*People v. Bean* (1988) 46 Cal.3d 919, 932-933; *People v. Sanchez* (1995) 12 Cal.4th 1, 3; *People v. Stanley* (1995) 10 Cal.4th 764, 793.)" (*Holt*, at p. 668.)

## B.

### *Evidence of Theft of Miner's Pickup Truck*

Defendant's argument rests on the assertion that the evidence at trial showed little more than defendant was in the vicinity where Miner's pickup truck was stolen. As defendant points out, no eyewitness saw him take or drive the truck. However, an examination of the entire record reveals a different overall picture.

Defendant's attempted carjacking of Luchs's vehicle showed he desperately sought transportation after walking away from Officer Maready at the gas station. Myer's testimony established there was an obvious police search for defendant as a police helicopter flew overhead. Myers also placed defendant at a location "just over the fence" from where Miner's truck was taken. This showed defendant urgently needed transportation at exactly the time and place that Miner's truck was taken.

Miner's truck was next seen by Roberts, who testified defendant showed up at her mobile home seeking to flee from the police. Defendant implored her to hide him. Roberts's mobile home was defendant's destination because he was looking for Melissa, who had previously lived there. In other words, Miner's truck ended up at defendant's destination where he hoped to find a hiding spot from the police.

Defendant's next vehicle theft was strikingly similar to the theft of Miner's truck. In both instances, a pickup truck was taken from an unlocked truck with the keys hanging in the ignition. Thus, the theft of Miner's truck constituted an integral part of defendant's path of flight from the police that started at the gasoline station and ended with crashing Simeroth's truck. Although no eyewitnesses saw defendant take or drive Miner's truck,

9

the evidence at trial inexorably points to defendant as the person who took Miner's truck from behind the Country Kitchen and left it near Roberts's mobile home.

Defendant argues the facts of this case are akin to *People v. Draper* (1945) 69 Cal.App.2d 781 (*Draper*). The *Draper* court reversed a burglary conviction where the evidence showed only that defendant (1) was riding in the same car as his codefendants before the burglary, (2) was near the burglarized business shortly after the crime was committed, (3) ran when approached by police officers, and (4) was not a truthful witness. (*Id.* at pp. 785-786.) By contrast, the evidence in this case showed more than defendant's mere proximity to where Miner's truck was taken. Instead, the evidence provided a context for theft of Miner's truck that showed an unbroken path between defendant's first contact with the police and his arrest on the outskirts of town. Defendant's path of flight from the police is broken only if the theft and recovery of Miner's pickup truck is ignored.

Likewise, we reject defendant's reliance on *People v. Graziano* (1948) 83 Cal.App.2d 701. As in *Draper, supra*, 69 Cal.App.2d 781, the *Graziano* court reversed a burglary conviction for insufficiency of the evidence because there was insufficient connection between defendant and the burglary. (*Graziano, supra,* at p. 706.) The evidence showed only that defendant was at least 150 to 200 feet in front of a business that was entered from the rear -- a location from which "he could not have been of any possible aid" to the burglars even if "he had desired to be." (*Id.* at p. 705.) Although the defendant was not truthful with police officers when he was contacted, he was not found among the burglars inside the business. (*Ibid.*) This evidence did not constitute substantial evidence. (*Ibid.*) The proof in this case shows a sufficient connection. As we have noted, the evidence showed an unbroken path taken by defendant into which the theft of Miner's truck fits perfectly from beginning to end. Based on the entire record, the jury had sufficient evidence to convict defendant of the theft of Miner's pickup truck.

## II

### *Sufficiency of the Evidence of Criminal Threat*

Defendant next argues insufficient evidence supported his conviction of criminal threat because the prosecution failed to prove Luchs felt sustained fear.  The argument has merit.

### A.

### *Criminal Threat* (*Section 422*)

Section 422, subdivision (a), provides, in pertinent part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally . . . , is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

For a conviction of section 422, the prosecution had to show that "the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 228.)  "The phrase to 'cause[] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component.  A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*In re Ricky T*. (2001) 87 Cal.App.4th 1132, 1140.)  "Sustained fear" means "a period of time 'that extends beyond what is momentary, fleeting, or transitory.' " (*Ibid*.)  What constitutes "sustained fear" may depend on the circumstances:  "Fifteen minutes of fear of a defendant who is armed, mobile, and at large, and who has threatened to kill the

11

victim and her daughter, is more than sufficient to constitute 'sustained' fear for purposes of this element of section 422." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

The California Supreme Court has explained that "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*People v. Toledo* (2001) 26 Cal.4th 221, 231 (*Toledo*).)

In *Toledo*, the defendant was charged with violating section 422 when he told his wife, "You know, death is going to become you tonight. I am going to kill you." (*Id.* at p. 225.) The *Toledo* court noted this "was the type of threat that satisfied the provisions of section 422 and reasonably could have caused [his wife] to be in sustained fear for her own safety." (*Id.* at p. 235.) Defendant's wife "responded that she did not care, in a manner that indicated she had given up hope, and walked away." (*Id.* at p. 225.) And at trial, the wife testified she had not been afraid. (*Id.* at p. 225.) On these facts, the Supreme Court held defendant was guilty only of attempted criminal threat. (*Ibid.*)

In reviewing the sufficiency of the evidence for defendant's conviction of criminal threat against Luchs, we again apply the substantial evidence standard of review as we have set forth in part I A.

## B.

### *Luchs's Testimony*

At the time of trial, Luchs was 70 years old. She testified that on January 3, 2011, defendant approached her "[f]orcefully." However, on direct examination by the

prosecutor, Luchs indicated she was not afraid of defendant. As she recounted, defendant only made her mad:

"Q [The prosecutor] And about how many times would you say he said, 'Don't make me kill you'?

"A [Luchs] He said 'Give me your car keys' and 'Don't make me kill you' at the same time initially, and then he just started saying, 'Don't make me kill you.'

"Q Did that concern you at all?

"A Well, yeah. I -- I thought he was crazy.

"Q Were you in fear for your safety?

"A I -- probably, and I probably reacted differently than I ever thought I would, but it really kind of made me mad.

"Q Why did it make you mad?

"A Because, I mean, that -- nobody comes up to somebody and tells them to give them their car keys."

The prosecution pointedly asked Luchs about whether she feared for her safety as follows:

"Q . . . Why did you lean on your horn, as you say?

"A Well, it was the only thing I could think of to draw attention to what was happening.

"Q And this might seem like kind of a silly question, . . . but why did you want to draw attention to what was happening?

"A Because I knew that probably -- I'd probably need some help.

"Q Why did you think you needed help?

"A Because a man had already threatened to kill me and now he had my car keys and I was -- and he's between -- he's right there by me and my door is between me and running anywhere, so I felt pinned in by him.

"Q When he had grabbed your car keys and when you felt pinned in by him, were you concerned at that point for your safety?

"A Honestly, in something like that, you -- I just didn't think about that. I just thought of what to do right now to draw some attention to what was happening.

"Q After all this was over and after it had taken place, did you have further thoughts about your safety or your fear?

"A No. Actually, he -- when I leaned on the horn, he looked at me like, why did you do that? That was the way I read the look, and then he threw my keys in the car."

Luchs did not testify she was afraid of defendant at any point. After defendant walked away from her, she recounted: "I started dialing [911] from my cell phone in the car, or I'd gotten it out, and then he kept looking back, so I decided it might not be a good idea to stay there. So I shut my car door and walked into -- inside of Aaron Brothers."

As in *Toledo*, the defendant's threat in this case was unequivocal and could have reasonably caused Luchs to be in sustained fear for her safety. (See *Toledo*, *supra*, 26 Cal.4th 221, at p. 235.) However, Luchs testified she was mad rather than afraid. Although the prosecutor's questions gave Luchs repeated opportunities to note any fear she might have experienced due to defendant's threats, Luchs did not indicate she was scared by the threats. Luchs noted she reacted differently than might be expected. Rather than being afraid, Luchs "just didn't think about that." Instead of fearing for her life, Luchs became mad and considered defendant to be crazy. In short, the evidence did not show sustained fear.

At sentencing, the trial court articulated the same conclusion when it stated: "I don't find the victim is particularly vulnerable given [Luchs's testimony]. She wasn't afraid of [defendant]. She testified that she wasn't. The jury found that he did threaten her, but she didn't take it that way. She was not fearful." We recognize the trial court's comment was made in the context of determining whether Luchs was particularly vulnerable -- which would have been an aggravating factor for purposes of selecting the

14

correct punishment. Nonetheless, the trial court's comment echoes our conclusion the evidence at trial did not show Luchs experienced sustained fear. In the absence of this element of section 422, the conviction for criminal threat must be reversed.

## III

### *Section 654*

Our conclusion that insufficient evidence supports defendant's conviction of criminal threat obviates the need to consider his argument section 654 requires a stay of either his conviction of criminal threat (§ 422) or attempted carjacking (§§ 215, subd. (a), 664) because both crimes were part of an indivisible course of conduct.

## IV

### *Prior Prison Enhancements*

Defendant contends, and the Attorney General concedes, the prison term enhancement under section 667.5, subdivision (b), must be stayed because the same prior was used for the five-year enhancements under section 667, subdivision (a)(1). We agree.

Defendant's conviction for a 2003 first degree burglary in Shasta County was alleged under sections 667, subdivision (a)(1), and under 667.5, subdivision (b). The trial court found the allegations to be true. The court imposed a five-year enhancement for the conviction under section 667, subdivision (a)(1), as well as a one-year enhancement pursuant to section 667.5, subdivision (b), with the terms to run consecutively. However, "when multiple statutory enhancement provisions are available for the same offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*People v. Jones* (1993) 5 Cal.4th 1142, 1150.) Accordingly, the one-year enhancement imposed under section 667.5, subdivision (b), must be stricken. (*Id.* at p. 1153; *People v. Perez* (2011) 195 Cal.App.4th 801, 805.)

DISPOSITION

Defendant's conviction of criminal threat (Pen. Code, § 422) is reversed. The remaining convictions are affirmed, and the matter is remanded for resentencing on the remaining convictions. The trial court is directed to strike the one-year sentence enhancement imposed under Penal Code section 667.5, subdivision (b), to issue an amended abstract of judgment, and forward a certified copy to the Department of Corrections and Rehabilitation.


      HOCH    , J.


We concur:


     HULL    , Acting P. J.


    MURRAY  , J.